**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| CHRISTOPHER NEARY, | : | |
| *Plaintiff*, | : | CIVIL CASE NUMBER: |
| | : | |
| v. | : | 3:14-cv-001631-VLB |
| | : | |
| SYED JOHAR NAQVI, M.D. | : | July 27, 2017 |
| sued in individual capacity | : | |
| and official capacity, *et al.*, | : | |
| *Defendants*. | : | |

### MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS [DKT. 89]

Plaintiff, Christopher Neary ("Neary"), is a paroled former inmate who developed gynecomastia[1] while in prison. Neary seeks declaratory relief, injunctive relief, and monetary damages for his claims of deliberate indifference to a serious medical need and cruel and unusual punishment in violation of the Eighth Amendment as applied to the states under the Fourteenth Amendment. The operative Amended Complaint contains allegations against three groups of Defendants: treating physicians, Utilization Review Committee members, and Wardens from various facilities where he was housed. Defendants seek dismissal for lack of subject matter jurisdiction, insufficient service of process, and failure to state a claim upon which relief may be granted. For the foregoing reasons, Defendants' motion is DENIED IN PART and GRANTED IN PART.

---

[1] Gynecomastia is the "excessive growth of the male mammary glands, in some cases including development to the stage at which milk is produced, usually associated with metabolic derangements that lead to estrogen accumulation, testosterone deficiency, and hyperprolactinemia." *Nelson v. Rodas*, No. 01Civ.7887, 2002 WL 31075804, at *7 n.15 (S.D.N.Y. Sept. 17, 2002).

## BACKGROUND

I.    **The Parties**

Neary entered the custody of the Connecticut Department of Corrections ("CDOC") in April 2006 and remained in custody at the time he filed his complaint nearly two years ago in October of 2014.  [Dkt. 1 (Compl.) ¶ 1; Dkt. 83 (Am. Compl.) ¶ 25].  Neary has been housed at several facilities within the CDOC system.  With respect to relevant dates, Neary was first housed at McDougall Walker Correctional Institution ("MWCI") from August 2013 until December 21, 2014, when CDOC transferred him to Osborn Correctional Institution ("OCI").  [Dkt. 83 ¶¶ 27-28].  He remained at OCI from December 22, 2014 until November 24, 2015, when CDOC transferred him to Enfield Correctional Institution ("ECI").  *Id.* ¶¶ 29-30.  Neary stayed at ECI for only four days.  *Id.* ¶ 31.  On November 30, 2015, CDOC transferred him to Corrigan Ragdowski Correctional Center where he remained for 21 days.  *Id.* ¶ 32-33.  Then on December 22, 2015, he was again transferred to Willard Cybulski Correctional Institution ("WCCI") where he stayed until September 2016.  *Id.* ¶ 35; *see* [Dkt. 101 at 4].  In September 2016, CDOC transferred Neary to the Walter Brooks House, a male-only work release program with 67 beds.  [Dkt. 101 (Opp'n Mot. Dismiss) at 4 n.3].  He stayed there for three months and in December 2016, CDOC discharged him and released him on parole where he now lives at an approved private residence.  *Id.* at 4 n.4.

During the time of his incarceration at CDOC facilities, he consumed regular meals provided by CDOC.  [Dkt. 83 ¶ 36].  These meals contained soy and/or soy byproducts.  *Id.*  While incarcerated he developed symptoms of and was diagnosed

with gynecomastia, a hormonal disorder that causes "enlargement of the glandular breast tissue." *Id.* ¶¶ 18, 20. Gynecomastia can be caused by several factors including "high levels of estrogen resulting from ingestion of phytoestrogen—a component of soy food products that has estrogen-like properties." *Id.* ¶ 22.

The Defendants can be split into three categories of individuals: treating physicians, reviewing physicians, and CDOC Wardens. The first category is comprised of Syed Johar Naqvi, M.D. ("Dr. Naqvi") and Lavern A. Wright ("Dr. Wright"), the physicians employed by the University of Connecticut ("UConn") Health Center who directly treated Neary. Dr. Naqvi treated Neary from January 19, 2014 until December 21, 2014, while he was housed at MWCI. *See id.* ¶¶ 57, 167]. Dr. Wright treated Neary from March 16, 2015, until November 25, 2015, while he was housed at OCI. *See id.* ¶¶ 169, 199.

The second group is Johnny Wu, M.D. ("Dr. Wu") and John Does 1–10 as they were employed by the UConn Health Center and served on the Utilization Review Committee ("URC"), the group that evaluates inmates' requests for off-site medical care. *See* [Dkt. 1 ¶¶ 5, 13].

The last category is comprised of the individuals who were Wardens at the relevant CDOC facilities during the time Neary was housed: MWCI Warden Peter Murphy ("Murphy"), MWCI and OCI Warden Carol Chapdelaine ("Chapdelaine"), ECI Warden Walter Ford ("Ford"), CRCC Warden Antonio Santiago ("Santiago"), and WCCI Warden John Tarascio ("Tarascio"). All individuals are sued in their individual and official capacities.

II.    <u>August 2013 to December 21, 2014: MWCI</u>

Neary began to experience pain in his nipples beginning August 2013.  [Dkt. 83 ¶ 43].  Over the course of several months, small lumps in his breasts formed and continued to grow, and Neary experienced increasingly severe pain and tenderness in his breasts.  *Id.* ¶¶ 44-48.  On December 16, 2013, Neary felt a large lump in his left breast extending from his nipple to his armpit and the same day he submitted a request to the Medical Department at MWCI asking for a doctor appointment.  *Id.* ¶¶ 49-52.  Four days later, Neary went to sick call where a nurse examined him; in response she submitted a request for Neary to be examined by Dr. Naqvi.  *Id.* ¶¶ 53-56.

The next month on January 19, 2014, Dr. Naqvi examined Neary and determined that a mammogram would be medically necessary to evaluate whether the lumps were cancerous.  *Id.* ¶¶ 57, 61, 65.  Because the mammogram would have to be conducted at the UConn Health Center, Dr. Naqvi was required to and did submit a request for approval by the URC.  *Id.* ¶ 62-64. The URC denied the mammogram request and instead approved a less expensive ultrasound.  *Id.* ¶¶ 67-69.  Neary was transported to UConn Health Center for an ultrasound on March 10, 2014.  *Id.* ¶ 70.  When he was there he notified the treating medical professionals that Dr. Naqvi requested a mammogram to evaluate whether the lumps were cancerous, and the medical professionals agreed that an ultrasound was insufficient to evaluate cancer; they performed a mammogram that day.  *Id.* ¶¶ 70-75.  Amish P. Patel, M.D. ("Dr. Patel") and/or Alex Merkulov, M.D. ("Dr. Merkulov") diagnosed Neary with non-cancerous "palpable/painful moderate to severe

4

gynecomastia" and informed Neary of these results. *Id.* ¶¶ 77-78.  They informed Neary that he would need laboratory testing to determine the cause of his gynecomastia and that the only total treatment was surgical removal, and on the same day Neary notified a nurse at sick call of the same. *Id.* ¶¶ 79-81.

Seventeen days later on March 27, 2014, Dr. Naqvi requested a blood sample for laboratory testing and Neary submitted the sample on the same day. *Id.* ¶¶ 82-84.  The results indicated Neary had a prolactin level of 20.26 ng/mL, nearly twice the high end of the normal range for males (2.64 to 13.13 ng/mL). *Id.* ¶¶ 86-87.  Neary submitted requests for an appointment with Dr. Neary on April 7, 2014, and May 22, 2014, to discuss a treatment plan and the laboratory results. *Id.* ¶¶ 88-90.  Naqvi did not respond to either request. *Id.* ¶¶ 89, 91.  Neary then scheduled an appointment at a sick call and he met with Dr. Naqvi on June 8, 2014.

On June 8, 2014, Dr. Naqvi informed Neary that the laboratory results did not reveal whether dietary soy or some other factor caused Plaintiff's gynecomastia. *Id.* ¶ 100.  He did not provide Neary with a copy of his laboratory results. *Id.* ¶ 102.  Dr. Naqvi submitted a request to the URC for Neary to meet with a surgeon. *Id.* ¶ 108.  He also prescribed Neary Motrin 600mg to alleviate the pain, which Neary did not receive until June 13, 2014. *Id.* ¶¶ 110-11.  Neary's prescription ended on June 25, 2014, and he did not receive additional pain medication until August 8, 2014. *Id.* ¶ 115.

On June 12, 2014, the URC denied Dr. Naqvi's request for a surgical referral. *Id.* ¶ 116.  Neary submitted a request to learn the URC determination on June 15, 2014, and a nurse informed him of the denial on June 18, 2014. *Id.* ¶ 118.  Neary

appealed the URC denial the following day by submitting a Medical Administrative Remedy Form ("First MAR Form"). *Id.* ¶ 119. He thereafter made a request to meet with Dr. Naqvi to discuss the denial, and he received an appointment for July 20, 2014. *Id.* ¶ 121. During this examination, Dr. Naqvi told Neary he would make a second request to meet with a surgeon. *Id.* ¶ 126. For the interim and upon Neary's request, Dr. Naqvi prescribed Neary stronger pain medication: Tylenol 650 mg. *Id.* ¶ 129. On the same day, Neary submitted a request for the status of his appeal, the First MAR Form. *Id.* ¶ 135.

Neary had not received his pain medication on July 28, 2014, which prompted him to file a request and accordingly he obtained his medication on August 8, 2014. *Id.* ¶¶ 131-32. This medication did not alleviate the pain. *Id.* ¶ 130. The same day he made the medication request, he also filed a request to be notified of the status of Dr. Naqvi's renewed request for URC to approve of Neary meeting with a surgeon. *Id.* ¶ 136.

Neary filed several requests, grievances, and appeals in the month of August 2014. He filed a Second MAR Form on August 5, 2014 regarding the status of the First MAR Form. *Id.* ¶ 137. Dr. Naqvi notified Neary on August 10, 2014, that the URC had denied his renewed request. *Id.* ¶ 138. When prompted, Neary refused to sign the denial. *Id.* ¶ 140. Neary also filed a Level 2 Grievance Appeal Form on August 15, 2014, appealing the denial of both MAR Forms. *Id.* ¶¶ 144. On August 18, 2014, Neary requested a copy of the URC denial but he never receive one. *Id.* ¶¶ 141-43. Then on August 22, 2014, Neary submitted a request regarding the status of his Level 2 Grievance Form. *Id.* ¶ 145. This same day he filed a request

6

for appointment with Dr. Naqvi because the Tylenol 650 mg did not alleviate his pain, but he did not receive a response. Finally, on August 26, 2014, Neary filed a request for Dr. Wu to provide a treatment plan for gynecomastia, but he did not receive a response. *Id.* ¶ 150.

The month of September was nearly as busy. Neary was informed that a Level 2 Grievance Appeal Form was the incorrect form, so he filed an Appeal of Health Services Review Form on September 8, 2014. *Id.* ¶¶ 146-47. On September 19, 2014, Neary filed a second request for Dr. Wu to provide a treatment plan, to which he never received a response. *Id.* ¶ 152-53. He also filed a request to be seen by Dr. Naqvi on this day due to his pain and the fact that his Tylenol 650 mg prescription was set to expire on September 20. *Id.* ¶ 155. Neary filed a second request to see Dr. Naqvi for the same reasons on September 30, 2014, because he did not previously receive a response. *Id.* ¶ 157.

On October 7, 2014, Neary went to sick call for his gynecomastia pain, and the nurse put him on a list to meet with Dr. Naqvi. *Id.* ¶¶ 158-59. Dr. Naqvi did not examine him until December 21, 2014, wherein he renewed the medication about which Neary complained. *See id.* ¶ 163. Neary was transferred to OCI on December 22, 2014. *Id.* ¶ 167.

III.    <u>December 22, 2014 to November 24, 2015: OCI</u>

Neary did not receive pain medication until January 12, 2015, but even when he began treatment once again his pain was not alleviated. *Id.* ¶¶ 164-66. His pain continued for several months and in March 2015 Neary submitted a request for an appointment with a physician. *Id.* ¶ 168. Dr. Wright examined Neary on March 16,

2015, and Neary explained the progression of his gynecomastia. *Id.* ¶¶ 169-70. Dr. Wright prescribed him a soy-free diet and Tylenol #3 to alleviate the pain. *Id.* ¶¶ 173, 178.

The lumps in Neary's breasts stopped increasing in size during the time he ate a soy-free diet. *Id.* ¶ 175. However, Tylenol #3 did not fully alleviate his pain. *Id.* ¶ 180. On July 27, 2015, Dr. Wright changed his prescription to Dolobid 500 mg. *Id.* ¶ 184. Because this too did not alleviate his pain, Dr. Wright prescribed a Fentanyl patch to be changed every third day at sick call. *Id.* ¶ 187. "The fentanyl transdermal system (patch) is used for the management of persistent, moderate to severe chronic pain in opioid-tolerant patients when a continuous, around-the-clock opioid analgesic is needed for an extended period of time." U.S. Dep't of Health and Human Servs., U.S. Food & Drug Administration, *Fentanyl Transdermal System (marketed as Duragesic) Information*, available at https://www.fda.gov/Drugs/DrugSafety/ucm114961.htm. Neary took this narcotic as prescribed, but it caused constipation and his pain did not fully subside. *Id.* ¶ 190-92.

On November 5, 2015, Dr. Wright discontinued the Fentanyl patch and a nurse removed it, which instilled three days of "severe symptoms of narcotics withdrawal including, nausea, dizziness, vomiting, loss of appetite, aches, chills, restlessness, and severe muscle spasms in his arms and legs, in addition to the already present severe pain in his breasts areas." *Id.* ¶ 196. Neary did not receive any pain medication after the removal of the patch. *See id.* ¶ 211. CDOC transferred Neary on November 25, 2015. *Id.* ¶ 199.

### IV.     November 25, 2015 to November 29, 2015: ECI

ECI failed to follow Dr. Wright's prescription and did not give Neary a soy-free diet or pain medication.  *Id.* ¶¶ 200, 211.

### V.     November 30, 2015 to December 21, 2015: CRCC

CCRC also failed to follow Dr. Wright's prescription and did not give Neary a soy-free diet.  *Id.* ¶ 203.  On December 3, 2015, Neary submitted a request to the Medical Department due to his gynecomastia pain and his prescription for a soy-free diet.  *Id.* ¶ 204. Dr. [FNU] Urscilla, M.D. ("Dr. Urscilla") explained that Dr. Wu removed the soy-free diet from Neary's regimen.  *Id.* ¶ 207.  Dr. Urscilla also did not prescribe Neary pain medication.  *Id.* ¶ 210.  Neary suffered anxiety and emotional distress on account of his removal from a soy-free diet, and he has refused to eat regular meals provided by CDOC.  *Id.* ¶¶ 208-09.  Neary did not receive pain medication during this time.  *Id.* ¶ 211.

### VI.     December 22, 2015 to September 2016: WCCI

Shortly after Neary's arrival at WCCI, Dr. [FNU] Clements, M.D. ("Dr. Clements") conducted an intake examination on December 25, 2015, and Neary explained his history of gynecomastia and associated pain.  *Id.* ¶ 212.  Dr. Clement prescribed Neary Tylenol 650 mg, which he did not receive until December 31, 2015.  *Id.* ¶¶ 214-15.  Dr. Clement also notified Neary that he could request a soy-free diet, but Dr. Wu and the URC would have to approve of such a request.  *Id.* ¶ 219.  Around May 10, 2016,[2] Dr. Clement submitted a request, but he was transferred to a

---

[2] **The Amended Complaint lists the date as May 10, 2015, but the chronology of the facts and all other pertinent information suggests the request was submitted May 10, *2016.***

different building within WCCI on May 19 prior to approval or denial.  *See id.* ¶¶ 220-21.

## LEGAL STANDARD

Defendants move to dismiss Neary's injunctive relief claims and official capacity monetary claims for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).  *See* [Dkt. 83 at 8-11].  Defendants also move to dismiss all other claims under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief may be granted.  Although Defendants do not explicitly reference Fed. R. Civ. P. 12(b)(5), Defendants argue that all claims against John Does 1–10 should be dismissed for failure to properly serve because these individuals have not yet been identified and served.  *Id.* at 5-7.

### I.    Subject Matter Jurisdiction

"Federal courts are courts of limited jurisdiction. . . ."  *Gunn v. Minton*, 568 U.S. 251, 256 (2013).  If a court lacks subject matter jurisdiction, it must dismiss the action.  *See* Fed. R. Civ. P. 12(h)(3).  A "district court must take all uncontroverted facts in the complaint [ ] as true, and draw all reasonable inferences in favor of the party asserting jurisdiction."  *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014).  However, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings. . . ."  *Id.*; *Dukes v. New York City Employees' Ret. Sys., & Bd. of Trustees*, 581 F. App'x 81, 82 (2d Cir. 2014) (citing *Makarova v. United States,* 201 F.3d 110, 113 (2d Cir. 2000)).  The Court may weigh such evidence when assessing its subject-matter jurisdiction as long as the

jurisdictional facts do not overlap with factual questions going to the merits. *Alliance for Envtl. Renewal, Inc.*, 436 F.3d 82, 88 n.6 (2d Cir. 2006). "[T]he party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Tandon*, 752 F.3d at 243.

II.    <u>Failure to State a Claim</u>

A plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents

incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

### III.   <u>Insufficient Service of Process</u>

Although Defendants move to dismiss under Fed. R. Civ. P. 12(b)(1) and (b)(6), the motion to dismiss all counts against John Does 1-10 motion for failure to properly serve falls under Rule 12(b)(5) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 12(b)(5).  "When a defendant moves to dismiss under Rule 12(b)(5), the plaintiff bears the burden of proving adequate service."  *Dickerson v. Napolitano*, 604 F.3d 732, 752 (2d Cir. 2010) (quotation marks and alterations omitted).  Like the 12(b)(1) standard, "[i]n considering a motion to dismiss pursuant to 12(b)(5) for insufficiency of service of process, a Court must look to matters outside the complaint to determine whether it has jurisdiction."  *Koulkina v. City of New York*, 559 F.Supp.2d 300, 311 (S.D.N.Y. 2008) (quotation marks and alterations omitted).

Under federal and state law (the application of which is permitted by the Federal Rules of Civil Procedure), service of process against a private individual may be accomplished in one of four ways: (1) personal delivery; (2) leaving a copy at the individual's usual place of abode; (3) delivering a copy to duly authorized agent; or (4) "following state law for serving a summons in an action brought in

courts of general jurisdiction in the state where the district court is located or where service is made." *See* Fed. R. Civ. P. 4(e); Conn. Gen. Stat § 52-57(a).

Rule 4(m) requires the Court to dismiss the action without prejudice against the defendant or order that service be made within a specified time. Fed. R. Civ. P. 4(m). Insufficient service does not automatically entitle Defendants to relief, however. The time for service may be extended if "plaintiff shows good cause for the failure [to timely serve process]." Fed. R. Civ. P. 4(m); *see also Gerena v. Korb*, 617 F.3d 197, 203–04 (2d Cir. 2010) (observing that extensions are "mandatory, not discretionary").

## ANALYSIS

The Court will now address the grounds for dismissal in the order they appear under Rule 12 of the Federal Rules of Civil Procedure: first, subject matter jurisdiction under Rule 12(b)(1); second, insufficient service of process under Rule 12(b)(5); and third, failure to state a claim under Rule 12(b)(6).

I.    **12(b)(1): Subject Matter Jurisdiction Issues**

Defendants raise two separate issues questioning Neary's ability to establish subject matter jurisdiction as to two claims. First, Defendants argue that all official capacity claims should be dismissed against all Defendants with respect to monetary relief. Second, Defendants contend that all claims for injunctive relief should be dismissed because his release from WCCI renders such claims moot. The Court addresses each argument in turn.

### A.  *Claims for Monetary Damages*

The Eleventh Amendment divests federal courts of subject-matter jurisdiction over any claims for monetary damages against a state official acting in his official capacity unless the state has waived this immunity or Congress has enacted a valid override.  *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985). Section 1983 does not abrogate state sovereign immunity.  *See Quern v. Jordan*, 440 U.S. 332, 341–45 (1979).  "The State of Connecticut has not waived its Eleventh Amendment immunity from suit under 42 U.S.C. § 1983."  *Gyadu v. Appellate Court*, No. 3:09CV027 (SRU), 2009 WL 5110842, at *3 (D. Conn. Dec. 17, 2009) (citing cases therein).  New allegations cannot cure this defect.

Defendants seek dismissal of any claims against state employees in their official capacities for money damages.  Neary has pointed out that he seeks monetary damages only with respect to claims against Defendants in their individual capacities.  *See* [Dkt. 83 at 33 of PDF (Prayer for Relief) (seeking "[a]n award of compensatory damages against Defendants in their individual capacities")].  To clear the confusion, the Court notes for the record that it lacks subject matter jurisdiction of all official capacity claims for money damages and, were Neary to have sought such relief the Court would have dismissed the claims without prejudice.  *See Hernandez v. Conriv Realty Assocs.,* 182 F.3d 121, 123 (2d Cir. 1999) ("[W]here a court lacks subject matter jurisdiction, it also lacks the power to dismiss with prejudice.").

Neary's individual capacity claims for monetary damages are not subject to dismissal because "[t]he Eleventh Amendment does not bar such suits, nor are

state officers absolutely immune from personal liability under § 1983 solely by virtue of the 'official' nature of their acts." *Hafer v. Melo*, 502 U.S. 21, 31 (1991); *see Harnage v. Dzurenda*, 176 F. Supp. 3d 40, 52 (D. Conn. 2016) ("State officials named in their individual capacities may be held personally liable for actions taken in their official capacities."); *Torres v. Trombly*, No. 3:03CCV696, 2004 WL 1497542, at *8 (D. Conn. June 29, 2004). The Court has subject matter jurisdiction over Neary's claims for monetary damages against Defendants in their individual capacities.

   B. *Mootness*

   Neary seeks an injunction requiring Defendants to (1) surgically remove his gynecomastia, (2) provide pain treatment pre- and post-surgery (the latter if deemed appropriate by a treating physician), and (3) permanently put Neary on a soy-free diet while "confined by CDOC." *See* [Dkt. 83, at p. 33 of PDF (Prayer for Relief)]. It is undisputed that Neary is no longer incarcerated in a CDOC facility. [Dkt. 101 at 4 (stating that Neary was housed at the Walter Brooks House from September to December of 2016, and subsequently he was released on parole where he now lives in a private residence)]. The parties dispute whether Neary's requests for injunctive relief are moot now that he is no longer incarcerated at WCCI because he is capable of providing his own medical care.

   When there is no "legally cognizable interest in the outcome," the case is moot and the federal court lacks jurisdiction. *Fox v. Bd. of Trustees of State Univ. of New York*, 42 F.3d 135, 140 (2d Cir. 1994) (internal quotation marks and citations omitted); *see Muhammad v. City of New York Dep't of Corr.*, 126 F.3d 119, 123 (2d Cir. 1997) (stating mootness is "a condition that deprives the court of subject

matter jurisdiction") (internal quotation marks and citations omitted).  Article III of the Constitution limits federal court jurisdiction to cases to live cases and controversies.  *See Lillbask ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 84 (2d Cir. 2005); *Etuk v. Slattery,* 936 F.2d 1433, 1441 (2d Cir. 1991) (stating "the mootness doctrine requires that the plaintiffs' claims remain alive throughout the course of the proceedings")  (emphasis added); *Amador v. Andrews*, 655 F.3d 89, 99-100 (2d Cir. 2011) ("[T]he mootness doctrine ensures that the occasion for judicial resolution established by standing persists throughout the life of a lawsuit.").  "A party seeking to have a case dismissed as moot bears a heavy burden."  *Lillbask*, 397 F.3d at 84.  A defendant may satisfy this burden by establishing that (1) "there is no reasonable expectation . . . that the alleged violation will recur," and (2) "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation."  *New York State Nat'l Org. for Women v. Terry*, 159 F.3d 86, 91 (2d Cir. 1998) (quoting *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).  Here, Defendants cannot meet either of the elements set out in *New York State Nat'l Org. for Women v. Terry* as it cannot be said that the condition will not recur because Plaintiff is a parolee, as discussed further below.

In addition, one exception to the general mootness doctrine is when a case is "capable of repetition, yet evading review."  *Lillbask*, 397 F.3d at 84-85 (quoting *Murphy v. Hunt*, 455 U.S. 478, 482 (1982) (per curiam)).  This exception applies only in "exceptional situations" where both "(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a

reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* (internal quotation marks and citations omitted).

Typically a plaintiff's claims for injunctive relief against correctional staff or conditions of confinement are moot when the inmate is released or discharged. *See Mawhinney v. Henderson*, 542 F.2d 1, 2 (2d Cir. 1976) (inmate's request for injunctive relief against correctional staff or conditions of confinement at a particular correctional institution becomes moot when the inmate is transferred to a different correctional institution); *Martin–Trigona v. Shiff*, 702 F.2d 380, 386 (2d Cir. 1983) ("The hallmark of a moot case or controversy is that the relief sought can no longer be given or is no longer needed"). It naturally follows that an exception to this general principle exists where the harm is capable of repetition. "[T]he capable-of-repetition doctrine applies only in exceptional situations, and generally only where the named plaintiff can make a reasonable showing that he will again be subjected to the alleged illegality." *City of Los Angeles v. Lyons*, 461 U.S. 95, 109 (1983); *see Altman v. Bedford Cent. Sch. Dist.*, 245 F.3d 49, 71 (2d Cir. 2001) (narrow exception to dismissal of moot claim exists if claim is "'capable of repetition, yet evading review'") (quoting *City of Los Angeles v. Lyons*, 461 U.S. at 109). Courts in this circuit have applied the "capable of repetition, yet evading review" exception to circumstances where an inmate could be returned to his or her place of confinement. *See, e.g., Pugh v. Goord*, 571 F. Supp. 2d 477, 489 (S.D.N.Y. 2008) ("To find otherwise would mean that prison officials could simply transfer a prisoner from facility to facility in order to moot his claims, even where the same conditions that underlie the plaintiff's litigation are present at the new

facility."); *Rosales v. LaValley*, No. 9:11-cv-106 (MAD/CFH), 2014 WL 991865, at *5 (N.D.N.Y. 2014) (finding the "capable of repetition, yet evading review" exception applied because plaintiff challenged a directive applicable to all New York state prison facilities).  Specifically, the duration element is satisfied because the plaintiff can be freely transferred amongst the prison facilities, and the reasonable expectation element is satisfied because the plaintiff can be subject to another transfer.  *See Pugh*, 571 F. Supp. 2d at 489.  This logic applies equally to a prisoner who is paroled and remains in custody.

Other courts, however, have found that where the individual is no longer incarcerated the claims injunctive relief are moot.  *See, e.g., Roque v. Armstrong*, 392 F. Supp. 2d 382, 386-87 (D. Conn. 2005) (finding that because plaintiff was discharged from prison "any request for injunctive relief concerning the provision of medical care or proper accommodation for his disabilities by the former Commissioner of Correction or the Department of Correction is now moot"); *Figueroa v. Semple*, No. 3:12-cv-00982 (VAB), 2015 WL 3444319, at *8 (D. Conn. May 28, 2015) (denying as moot plaintiff's request for injunctive relief because "[t]he plaintiff has been discharged from the custody of the Department of Correction"); *Hallet v. New York State Dep't of Corr. Servs.*, 109 F. Supp. 2d 190, 196 (S.D.N.Y. 2000) (holding that "[b]ecause [plaintiff] is no longer incarcerated and under the supervision of any of the named defendants, his requests for injunctive relief are dismissed as moot" where plaintiff previously sought injunctive relief for being denied access to special programs because of his status as an HIV-positive

amputee).[3]  In those cases, the issue of repetition was not reached.

Plaintiff remains in CDOC custody. Connecticut General Statute provides in relevant part that "any person confined in a correctional institution or facility who has been granted parole release" may be released from confinement and transferred to "any public or private nonprofit halfway house, group home or mental health facility or to an approved community or private residence."  Conn. Gen. Stat. § 54-125h.  When this occurs, during the 18-month period of release the person remains under the Commissioner of Correction's custody, employees of the CDOC are responsible for supervision, and the person "may, at any time, be returned to confinement in a correctional facility."  *Id.* (emphasis added); *see generally Best v. Bellevue Hosp. New York, NY*, 115 F. App'x 459, 461 (2d Cir. 2004) (finding as moot petitioner's habeas corpus petition because he "has been released from custody without any restrictions") (emphasis added).  This conclusion is further supported by the decision of the District Court for the District of Columbia in *Fletcher v. United States Parole Comm'n*, 550 F.Supp.2d 30 (D. D.C. 2008).  In that case the court held that a prisoner's claims for injunctive or declaratory relief based on an alleged violation of Ex Post Facto Clause were rendered moot by the prisoner's release from custody, but only because there was no allegation of any continuing collateral consequences arising from alleged violation of his rights.  Those are not the facts here. Plaintiff continues to be in

---

[3] Many of these discharge cases reviewed by this Court rely on *Mawhinney*, which denied plaintiff's injunctive relief claim as moot "[i]n view of the fact that appellant is no longer incarcerated at Auburn" even though was transferred to another facility.  *See Mawhinney*, 542 F.2d at 2 n.3.  These facts do not mirror the facts in the present case and the Court does not rely heavily upon these cases.

custody, continues to suffer from the medical condition and continues to experience pain.

The Court is further persuaded by the fact that a person is "in custody" for purposes or entitlement to habeas relief when they are serving the noncustodial portion of their sentence and susceptible to re-incarceration. *Scanio v. United States*, 37 F.3d 858, 860 (2d Cir.1994); *Abimobola v. United States*, 369 F. Supp. 2d 249 (E.D.N.Y. 2005) (stating physical confinement is not necessary to satisfy the in custody requirement of federal habeas corpus statutes; a petitioner who is on parole or serving a term of supervised release is in custody for the purposes of the federal habeas corpus statutes).  An analogous argument can be made here. *See Mock v. Warden*, 48 Conn. Supp. 470, 479 (Conn. Super. Ct. 2003) ("The parolee . . . faces a definite sentence that diminishes on a daily basis to which he could be returned without judicial intervention. Clearly, a parolee fits within the first alternative in § 52-466 as being a person 'confined,' albeit constructive versus actual.").   Hers, Plaintiff remains in CDOC custody and may be remanded summarily to prison at any time.

Several other factors portend the real possibility that Neary's medical treatment claims would very well evade review, the first being the frequency of transfers and inconsistency of Neary's treatment.  Neary was admitted on April 17, 2006, and was sentenced on January 1, 2007.  *See* [Dkt. 89-2 (Mot. Dismiss Ex. A, Neary's Inmate Information)].  His maximum sentence was 11 years and six months with a release date of February 13, 2017.  *Id.*  CDOC released Neary on parole earlier, in December 2016, *see* [Dkt. 101 at 4 n.4], which means he served approximately

ten years and eight months in prison.  Parolees who are returned to a CDOC facility for a parole violation "may be retained in a correctional institution for a period equal to the unexpired portion of the term of such inmate's sentence at the date of the request or order for such inmate's return less any commutation or diminution of such inmate's sentence earned, except that the Board of Pardons and Paroles may, in its discretion, determine that such inmate shall forfeit any or all of such earned time, or may be again paroled by said board."  Conn. Gen. Stat. § 54-128(a).  Furthermore, a parolee can be subject to the loss of any or all time earned.  Conn. Gen. Stat. § 54-128(b).  Neary, therefore, could be remanded to state prison for several months should be he returned to CDOC custody.

Neary has been transferred on several occasions, the multiplicity of which appears to have frustrated his ability to access medical care consistently.  For example, Neary was transferred from MWCI to OCI on December 22, 2015, the day after he obtained a prescription renewal that had expired in September.  *See* [Dkt. 83 ¶¶ 155, 163].  He did not receive the medication until January 12, 2015.  *Id.* ¶ 164.  In addition, Neary was transferred from OCI to ECI in November 2015, the same month Dr. Wright directed the removal of his Fentanyl patch.  *Id.* ¶¶ 196, 198.  He stayed at the next facility, ECI, for only four days before he was moved to CRCC, where he also stayed for less than a month.  *See id.* ¶¶ 199, 201, 212.  It was not until he finally landed at WCCI where he was able to see a physician who prescribed him pain medication that he received on December 31, 2015.  *Id.* ¶ 214.  The allegations in the Amended Complaint also indicate that his transfers might have impeded his ability to obtain a soy-free diet prescribed for him in March 16, 2015.

21

*Id.* ¶ 174.  Although Neary had a soy-free diet in OCI from March until November of 2015, the locations of his subsequent transfers, ECI to CRCC to WCCI, did not honor his need for medically-prescribed meals.  At some point Neary was informed that Dr. Wu removed him from a soy-free diet.  *Id.* ¶ 207.  Subsequently at WCCI, Neary was transferred to another building in WCCI nine days after he submitted a request for his physician to submit a request to the URC to be placed on a soy-free diet. *Id.* ¶¶ 220-21.

The second factor is the short duration of his remaining sentence and resulting brevity or re-incarceration should he be remanded to prison. Because Neary remains under the custody of CDOC, his release could be revoked at any time, and he has previously been subject to numerous transfers directly impacting his ability to access medical care, the Court finds that Neary's situation mirrors more closely *Pugh*, rather than *Hallett*.    The    applicable    Administrative Directive 11.3 sets forth the policy that CDOC "shall support the successful reintegration and supervision of offenders in the community unless it no longer appears that the offender will live and remain at liberty without violating the law or that the offender's release is no longer compatible with the welfare of society." [Dkt. 101-2 (Opp'n Mot. Dismiss Ex. 2), § 1].  Because there are myriad reasons why an individual could be determined "no longer compatible with the welfare of society," there is a reasonable expectation that he could be returned.

Accordingly, because Neary remains in custody, his claimed deprivation of medical treatment is ongoing, and CDOC's power to summarily remand Neary to physical custodial status his claims for injunctive relief are not moot and the Court

retains jurisdiction to adjudicate them.

II.    **12(b)(5): Insufficient Service of Process**

Defendants contend that the claims against John Does 1–10 should be dismissed for failure to properly serve.   Neary does not dispute that such individuals have not been served, as the identities of the individuals are unknown (at least as of the time the briefing was filed).   [Dkt. 101 at 22].   The names of these individuals are unknown despite the fact that Neary has alleged that they are CDOC healthcare providers and alleged the dates on which the acts and omissions complained of occurred which suggests that a review of his medical records would reveal their identities.

Neary argues that Connecticut case law enables a plaintiff to bring a case against a fictitious person so long as defendants (1) have actual notice of the action, (2) know they are proper defendants, and (3) are not prejudicially mislead by the use of fictitious names.  *See id.* at 23 (quoting *Barber v. Hartford*, No. CV93-529115, 1993 WL 540900, at *2 (Conn. Super. Ct. Dec. 21, 1993)). Neary cites *Tremblay v. Webster*, No. 530898, 1995 WL 93405 (Conn. Super. Ct. Feb. 22, 1995), an excessive force case which recognizes Connecticut trial courts' split on whether the failure to identify defendants constitutes an insufficiency of process issue. Plaintiffs in *Tremblay* alleged they attempted to learn of the John Doe troopers' identities but were prevented from seeking discovery after the Superior Court granted a stay pending the motion to dismiss.  *Id.* at *5.   The Superior Court acknowledged that the core of the case is a "civil rights claim" and that "it would seem a miscarriage of justice to allow the John Doe troopers to escape potential

liability," and further noted that "[t]o dismiss this action at this juncture might encourage state officials to hide their identities from the very people they are obligated to protect." *Id.* at *6. The Superior Court also observed that "since the assistant attorney general is pursuing these claims for the John Doe troopers, they are certainly aware of the institution of the action and know they are proper defendants" and that there existed no evidence of prejudice. *Id.* Based on these findings, the Superior Court denied the motion to dismiss and granted plaintiffs a reasonable opportunity to identify the John Doe troopers. *Id.*

Discovery has been ongoing for quite some time now, and the parties have encountered considerable disputes, one of which is still pending and pertains to the Defendant Wardens. *See* [Dkt. 129 (Mot. Protective Order) (filed July 12, 2017); Dkt. 133 (Minute Entry) (stating a discovery conference was held on July 17, 2017, and ordering Plaintiff to respond to Defendants' Motion for Protective Order)]. At the time when this Motion to Dismiss was filed, Defendants had not identified the John Does 1–10. Neary should have filed a motion for leave to amend the Amended Complaint if he had discovered the identities of John Does 1–10. The Court would be inclined to grant such a motion as Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Because the Amended Complaint describes the John Does as "members of the URC between January 2014, and the filing of this Amended Complaint," [Dkt. 83 ¶ 13], the Court finds that such information is specific enough to give Defendants the ability to identify the individuals, and as required under Fed. R. Civ. P. 26(b)(1) it is "proportional to the needs of the case,

considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." The Court assumes Defendants have supplied Neary with the identities of these individuals, and therefore Neary is directed to file a Second Amended Complaint identifying these individuals. But if Defendants have not yet identified the John Does as described, they are directed to do so or show cause why they cannot comply with this order within seven days of the date of this decision. Neary shall then amend his complaint within seven days after receiving the identities of the John Does 1–10.

III.   <u>12(b)(6): Failure to State a Claim</u>

In addition, Defendants move for dismissal pursuant to Fed. R. Civ. P. 12(b)(6) and argue the Amended Complaint contains legal conclusions and fails to state a claim upon which relief may be granted. Alternatively, Defendants also maintain that all are entitled to qualified immunity for the request for monetary damages.

At the outset, the Court finds that the 33-page Amended Complaint containing 252 paragraphs contains more than "legal conclusions," i.e. "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. The Court will thus address the plausibility of the factual allegations and, if they are sufficient to state a claim upon which relief may be granted, determine whether qualified immunity applies.

### A. *Deliberate Indifference*

"An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met."  *West v. Atkins*, 487 U.S. 42, 54 (1988) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  "[T]he State has a constitutional obligation, under the Eighth Amendment, to those whom it has incarcerated."  *West*, 487 U.S. at 54.

To state a claim for deliberate indifference to a serious medical need, an inmate must show both that his medical need was serious and that the defendants acted or failed to provide adequate medical care with a sufficiently culpable state of mind.  *See Smith v. Carpenter*, 316 F.3d 178, 184 (2d Cir. 2003) (citing *Estelle*, 492 U.S. at 105).  There are both objective and subjective components to the deliberate indifference standard.  *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994).  Objectively, the alleged deprivation must be "sufficiently serious."  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  The condition must be "one that may produce death, degeneration, or extreme pain."  *See Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996) (internal quotation marks omitted).  Subjectively, the defendants must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions.  *See Salahuddin v. Goord*, 467 F.3d 263, 280-81 (2d Cir. 2006).  Negligence that would support a claim for medical malpractice does not rise to the level of deliberate indifference and is not cognizable under Section 1983 (see id. at 280) nor does a difference of opinion regarding what constitutes an appropriate response and treatment.  *See Ventura v.*

*Sinha*, 379 F. App'x. 1, 2-3 (2d Cir. 2010); *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998).

In this case, the Court previously ruled in its Initial Review Order that gynecomastia could constitute a serious medical need. *See* [Dkt. 9 at 7 (citing *Fryman v. Traquina*, No. Civ. S-07-2636, 2011 WL 475872, at *9 (E.D. Cal. Feb. 4, 2011) (noting, based on evidence submitted by the parties, "a reasonable juror could conclude that plaintiff's left breast gynecomastia and related pain constitute an objective, serious medical need"); *Nelson v. Rodas*, No. 01CIV7887, 2002 WL 31075804, at *7 (S.D.N.Y. Sept. 17, 2002) (presuming gynecomastia could be serious medical need))]. Severe pain requiring high doses of pain medication can be a serious medical need in and of itself. *See Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003) (finding that chronic pain interfering with the ability to conduct daily tasks is sufficiently serious); *Atkins v. Coughlin*, 101 F.3d 1393, 1 (2d Cir. 1996) (acknowledging severe pain warranting prompt medical attention may satisfy the first prong of the deliberate indifference standard). The Amended Complaint is replete with allegations of the Defendants' knowledge of Neary's condition and their persistent failures to treat both the condition and the attendant pain. The Court will not disturb this ruling and thus only addresses the subjective component of the deliberate indifference claims.

## 1.    *Drs. Wu and Naqvi*

In the Initial Review Order, the Court also allowed deliberate indifference claims against Defendants Dr. Wu and Dr. Naqvi to proceed, finding Neary

adequately alleged the absence of and inadequate treatment, respectively, for the purposes of the Initial Review Order.  *Id.* at 8.

An initial review is made pursuant to Section 1915A, the statute requiring a court to screen "a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of governmental entity" to ascertain whether the complaint "is frivolous, malicious, or fails to state a claim upon which relief may be granted."  28 U.S.C. § 1915A.  Section 1915A and Rule 12(b)(6) require the same substantive analysis.  *Preston v. New York*, 223 F. Supp. 2d 452, 462 (S.D.N.Y. 2002) ("[A] court evaluates whether a complaint 'fails to state a claim upon which relief may be granted' under 28 U.S.C. § 1915A under the same standard as a motion to dismiss brought under Rule 12(b)(6)."); *see Manon v. Hall*, No. 3:14-CV-1510 (VLB), 2015 WL 8081945, at *3 (D. Conn. Dec. 7, 2015) (citing *Preston*, 223 F. Supp. 2d at 462).  Defendants' motion in effect seeks reconsideration of this Court's prior initial review order, but a party should pause before making such a request.  Fed. R. Civ. P. 60(b)(1); *see Olmos v. Ryan*, No. CV 10-2564-PHX-GMS-MEA, 2013 WL 394879, at *4 (D. Ariz. Jan. 31, 2013) ("The First Amended Complaint has already been screened pursuant to 28 U.S.C. § 1915, which uses the same standard as Federal Rule of Civil procedure 12(b)(6) . . . .  Defendants do not cite sufficient grounds to reconsider." (internal citation omitted)).

Outside of the grounds identified in Rule 60(b), it would also be appropriate for a party to move for dismissal on the basis of a waivable defense because courts need not consider those defenses *sua sponte*.  *See Alvarado v. Litscher*, 2000 WL 34239113, at *2 (W.D. Wis. Oct. 16, 2000) (ruling on qualified immunity defense

despite prior initial review order).  However, a party should never move to dismiss claims that have already been dismissed or seek dismissal of claims that the Court has determined to be non-frivolous solely on the basis that the moving party disagrees with the court's conclusion.

Defendants have not presented any reason to overturn its previous findings from the Initial Review Order.  The possibility that these doctors' determinations constitutes medical malpractice not rising to a constitutional violation is, in this case, better suited for summary judgment.  *See Chance v. Armstrong*, 143 F.3d 698 at 701 (stating that "[w]hether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case," and finding that at summary judgment "it may well become clear that Chance cannot proffer sufficient proof to create genuine issues of material fact. But in his complaint, he has alleged facts that are not impossible to prove and that, if demonstrated, would state a legally cognizable claim.").  Indeed, "[d]ismissal is not appropriate 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"  *Id.* (quoting *Conley v.* Gibson, 355 U.S. 41, 45-46 (1957)).  Because it is plausible that these individuals' delays in treatment, denials of treatment, and failure to provide pain medication constitutes deliberate indifference, the claims against Drs. Wu and Naqvi may go forward.[4]  While the Court recognizes that Defendants may have valid

---

[4] The Court also adds that Dr. Naqvi's failure to prescribe a soy-free diet does not necessarily mean he is free from liability on these grounds.  Defendants may present evidence to support their contentions that he should not be held liable for Neary's request for a soy-free diet.

defenses to Neary's claims, due process dictates that they fully and timely comply with their discovery obligations and present their defenses in accordance with applicable procedural and legal strictures.

Neary has, however, added more Defendants in the Amended Complaint, and the Court must evaluate the viability of these claims for the first time.

### 2.    Dr. Wright

Defendants do not specifically argue how, as they did for all other Defendants, Neary failed to plead the subjective component of the deliberate indifference standard for Dr. Wright.  Instead, Defendants claim that "Dr. Lavern Wright does not and has never been employed with Correctional Managed Health Care or the Department of Correction."  [Dkt. 89-1 at 1].  The issue of Dr. Wright's identification was also raised in Defendants' Motions to Quash wherein Defendants objected to the request for production of documents pertaining to Dr. Lavern Wright.  *See* [Dkt. 99-1 (UHC Mot. Quash) ¶ 23 (objecting to the production of "[a]ll documents relating to any complaint or grievance pertaining to Lavern A. Wright, M.D. filed by an inmate, colleague, supervisor, or any other party during his employment by UConn Health Center."); Dkt. 100-1 (CDOC Mot. Quash) ¶ 22 ("All documents relating to any complaint or grievance pertaining to any of the Defendants filed by an inmate, colleague, supervisor, or any other party during his employment by UConn Health Center.")].  The Court sustained these objections "because defense counsel attest[ed] there is no physician of that name employed at UHC," but it did grant Neary the opportunity to seek to serve a subpoena on the

actual Dr. Wright who treated him.  *See* [Dkt. 108 (Order on UHC Mot. Quash) at 2; Dkt. 109 (Order on CDOC Mot. Quash) at 2].

The Amended Complaint alleges specific facts in support of the claims against Dr. Wright, which should enable CDOC to review Neary's medical records and identify the physician against whom those claims should likely be leveled if Plaintiff has named the wrong person.  It alleges that Dr. Wright treated Neary while housed at OCI and prescribed Neary a soy-free diet, and that during this period his breasts did not increase in size.  *See* [Dkt. 83 ¶¶ 173-75].  Dr. Wright prescribed Neary Tylenol #3 and Dolobid 500 mg, neither of which alleviated his severe pain. *Id.* ¶¶ 178-86.  He then prescribed Neary a Fentanyl patch on August 7, 2015, but in November 2015 he directed a nurse to remove the Fentanyl patch without a replacement.  *See id.* ¶ 187-195.  This caused Neary to experience withdrawal of the narcotic.  *See id.* ¶¶ 196-98.  At the end of November Neary was transferred to ECI. *Id.* ¶ 199. For the same reasons that Neary's claim against Dr. Naqvi should go forward, the Court finds the claim against Dr. Wright should survive the motion to dismiss.  Although Dr. Wright's treatment could be characterized as a disagreement in treatment, Neary has adequately alleged inadequate treatment at this stage.

Accordingly, Defendants are ordered to review Neary's medical record and within seven (7) days of the date of this decision disclose to Plaintiff's counsel the identities of John Does 1–10 or show cause why they are unable to do so along with a sealed copy of Neary's entire medical record.  Neary is directed to file a Second Amended Complaint naming the John Does, including doctor who treated

Neary at OCI and prescribed him Tylenol #3, Dolobid 500 mg, and the Fentanyl patch within seven (7) days of the Defendant's disclosure of their names.

3.      *Warden Defendants*

The original complaint did not assert any claims against any Wardens, but the Amended Complaint now asserts deliberate indifference claims against individuals who were Wardens at the facilities at the time when Neary was housed and after he began to experience breast pain.  The Amended Complaint does not assert any facts specific to any of the Wardens.  Rather, Neary alleges the Wardens acted with deliberate indifference by requiring Neary to consume a diet high in soy, including the time period in which Dr. Wright ordered a soy-free diet.  *See* [Dkt. 83 ¶ 248(a)-(e)].

To recover money damages under section 1983, plaintiff must show that the Wardens were personally involved in the constitutional violations.  *See Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  Supervisory officials cannot be held liable under section 1983 solely for the acts of their subordinates. *See Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985).  The plaintiff may show personal involvement through evidence of one or more of the following: (1) that the defendant actually and directly participated in the alleged unconstitutional acts; (2) that the defendant failed to remedy a wrong after being informed of the wrong through a report or appeal; (3) that the defendant created or approved a policy or custom that sanctioned objectionable conduct which rose to the level of a constitutional violation or allowed such a policy or custom to continue; (4) that the defendant was grossly negligent in supervising the correctional officers who committed the

constitutional violation; or (5) that the defendant failed to take action in response to information regarding the occurrence of unconstitutional conduct. *See Colon*, 58 F.3d at 873. In addition, the plaintiff must demonstrate an affirmative causal link between the inaction of the supervisory official and his injury. *See Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

In *Iqbal*, the Supreme Court addressed the issue of supervisory liability and concluded that a supervisor can be held liable only "through the official's own individual actions." 556 U.S. at 676. Although this decision arguably casts doubt on the continued viability of some of the categories for supervisory liability set forth in *Colon*, the Second Circuit has not revisited the criteria for supervisory liability following *Iqbal. See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test ... after *Iqbal*."); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that decision in *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations," but finding it unnecessary to reach the impact of *Iqbal* on the personal involvement requirements set forth in *Colon*). Because it is unclear as to whether *Iqbal* overrules or limits Colon, the Court will continue to apply the categories for supervisory liability set forth by the Second Circuit.

The body of the Amended Complaint does not mention any of the Wardens. The first, second, and fifth factors are not satisfied because the Amended Complaint fails to mention whether any of the Wardens became aware of and/or were informed of Neary's condition while incarcerated in the CDOC facilities or that

they knew about Neary's need for a soy-free diet prior to or after Dr. Wright prescribed him a soy-free diet.  Neary claims in his Opposition to the Motion to Dismiss that "the Warden Defendants created, allowed to continue, or enforced a custom, policy or practice of providing inmates on the 'regular' diet meals containing high amounts of soy that is known to cause or exacerbate gynecomastia."  [Dkt. 101 at 40]. This is a conclusory allegation without factual support, however, because there is no indication that there existed a policy to provide diets high in soy, that the effects on gynecomastia were known, or that the Wardens created or approved of such a policy.  Conclusory allegations are not sufficient to state a plausible claim for supervisory liability.  *See Styles v. Goord*, 431 F. App'x. 31, 33 (2d Cir. 2011) ("The mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under 1983.").  The fourth factor is similarly unavailing because there is no reference to how the Wardens supervised the correctional employees. Accordingly, the claims against the Wardens are insufficient to state a claim for which relief can be granted and must be DISMISSED.

### 4.    *John Does 1–10*

The facts asserted against John Does 1–10 are largely the same as those against Dr. Wu: namely, that the members of the URC acted with deliberate indifference when denying Dr. Naqvi's requests for Neary's treatment to meet with a surgeon and obtain a mammogram.  *See* [Dkt. 83 ¶¶ 67, 116, 138].  For the same reasons the Court allowed the claims against Dr. Wu to proceed, the Court now does the same for John Does 1–10.

34

B. *Qualified Immunity*

The doctrine of qualified immunity shields government officials performing a discretionary function "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is an affirmative defense that requires the defendant to bear the burden of proof. *See Vincent v. Yelich*, 718 F.3d 157, 166 (2d Cir. 2013).

A public official sued in his or her individual capacity for money damages is entitled to qualified immunity if the defendant shows: (1) "the conduct attributed to him was not prohibited by federal law," or (2) "where that official action was so prohibited, if the plaintiff's right not to be subjected to such action was not clearly established at the time it was taken." *Id.* A "clearly established" right is one in which "[t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (quoting *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir.2011)) (internal quotation marks omitted). The right to be free from deliberate indifference to a serious medical need has been clearly established at least since the Supreme Court's decision in *Estelle v. Gamble*, 429 U.S. 97 (1976). *See Rahman v. Schriro*, 22 F. Supp. 3d 305, 316 (S.D.N.Y. 2014) (noting that the "right to be free from deliberate indifference to serious medical needs' . . . was clearly established 'as far back as 1976 by [*Estelle*]'" (quoting *Warren v. Keane*, 196 F.3d 330, 333 (2d Cir. 1999))). This inquiry is primarily objective: "[a]bsent 'extraordinary circumstances,' [i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably

competent public official should know the law governing his conduct." *Vincent*, 718 F.3d at 166 (internal quotation marks omitted). The defendants' belief is objectively reasonable if "'officers of reasonable competence could disagree' on the legality of the action at issue in its particular factual context." *Zalaski v. City of Hartford*, 723 F.3d 382, 389 (2d Cir. 2013) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Qualified immunity "should be decided as early as possible in a case" but it "is often best decided on a motion for summary judgment when the details of the alleged deprivations are more fully developed." *Walker v. Schult*, 717 F.3d 119, 130 (2d Cir. 2013). In essence, qualified immunity should be granted under Fed. R. Civ. P. 12(b)(6) if the face of the complaint clearly establishes the nonexistence of a constitutional right. *Vincent*, 718 F.3d at 167. Further facts may be required, however, where the plaintiff's complaint plausibly states a claim for deliberate indifference. *Walker v. Schult*, 717 F.3d at 130. After discovery is complete, "[w]here there are no genuinely disputed factual issues material to the qualified immunity defense, a defendant may move for summary judgment dismissing the plaintiff's claim on that basis." *Vincent*, 718 F.3d at 167.

Accordingly, the Court finds that dismissal on the basis of qualified immunity is not warranted at this time, but Defendants may raise qualified immunity anew at the summary judgment stage.

## CONCLUSION

For the aforementioned reasons, Counts IV and V are DISMISSED against Defendant Wardens Murphy, Chapdelaine, Maldonado, Ford, Santiago, and

Tarascio.  Counts I, II, III, IV and V remain against Defendants Dr. Wu, Dr. Naqvi, Dr. Wright, and John Does 1–10 for money damages in their individual capacities and for declaratory and injunctive relief.  Plaintiff is directed to properly identify Dr. Wright and John Does 1–10 in a Second Amended Complaint within 21 days of the date of this order.   The operative Scheduling Order remains in effect and will not be modified.

 IT IS SO ORDERED.

                                        _____/s/_____
                                        Vanessa L. Bryant
                                        United States District Judge

Order dated in Hartford, Connecticut on July 27, 2017.